UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ADAN JAMES CORONA,<br><br>Defendant. | 5:17-CR-50049-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 122). An evidentiary hearing was held on Wednesday, August 29, 2018. Defendant was personally present and represented by his attorney of record, John Murphy. The Government was represented by the Assistant United States Attorneys Sarah Collins and Kathryn Rich. Two witnesses testified at the hearing. Two exhibits were received into evidence. Supplemental briefing concluded on November 26, 2018. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## **JURISDICTION**

Defendant is charged in a Second Superseding Indictment with First Degree Murder (Premeditated) and First Degree Murder (Felony Murder), in

1

violation of 18 U.S.C. §§ 1111(a), 2, 1152 & 1153; Conspiracy to Commit Assault, in violation of 18 U.S.C. §§ 113(a)(3), 1152, 1153, & 371; Use of a Firearm during a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## **FACTUAL BACKGROUND**

Denver Police Officers Arturo Garcia and Bruce Kay testified at the August 29, 2018, evidentiary hearing. The court finds their testimony credible. For approximately two years, Officer Garcia has served on the Denver Gang Bureau patrolling neighborhoods in northeast Denver that have high gang activity. Officer Kay has worked on the Gang Bureau for approximately five years. Before working on the Gang Bureau, both officers served on proactive units tasked with handling gang crimes and other major issues in northeast Denver. At the hearing, the officers provided background on Denver's gang activity and described the events leading to Defendant Adan Corona's arrest on October 20, 2016.

Northeast Denver contains various gangs, including the Park Hill Bloods, the CMG Bloods, Chiqui 30s, East Side Crips, and East Side Oldies. (Doc. 247 at p. 5, 82). Gang members are often identifiable by tattoos, as well as by what they wear: East Side Oldies are known to wear black and frequently don

Chicago White Sox attire, while Crips wear blue attire and Bloods wear red attire. (Id. at p. 74–75).

On October 20, 2016, Officers Garcia and Kay were on routine patrol in a high-crime neighborhood in northeast Denver. (Id. at p. 6, 78). This particular neighborhood is associated with the East Side Oldies and the Crips. (Id. at p. 12, 82). The Oldies and Crips are rivals and constantly engage in gang-motivated violence, typically shootings, within the neighborhood. (Id. at p. 12). Oldies and Crips members are commonly armed and often carry drugs; Officer Garcia described personally removing firearms and drugs from gang members in that neighborhood. (Id. at p. 20).

At approximately 7:30 p.m. on October 20, 2016, Officers Garcia and Kay passed an Acura four-door sedan headed the opposite direction with no front license plate. (Id. at p. 6, 8, 81). Colorado is a two-plate state. The officers saw no rear plate when they passed the vehicle, so they turned around to get behind it. (Id. at p. 7). The officers were able to see a temporary tag in the rear window. When they approached, they observed that the temporary tag expired in June 2016. (Id.). Driving with expired tags constitutes a traffic violation in Colorado. (Id. at p. 25). Based on the traffic violation, the officers initiated a traffic stop of the vehicle. (Id. at p. 7–8).

Officer Garcia walked up on the passenger side of the stopped vehicle, and Officer Kay approached the driver's side occupants. (Id. at p. 8). A female sat in the driver's seat, another female occupied the passenger seat, and two males sat in the backseat with a toddler between them in a car seat. (Id. at p.

3

8–9, 13). Officer Garcia immediately noticed that the male in the passenger-side backseat—Mr. Corona—appeared extremely nervous and fidgety, had tattoos indicating possible gang membership, and had a black White Sox hat on his lap. (Id. at p. 9, 11, 32, 34). Based on these factors, Officer Garcia became suspicious that Mr. Corona was a gang member. (Id. at p. 11, 32–34).

Meanwhile, Officer Kay made contact with the driver of the vehicle. (Id. at p. 80). He observed two male passengers in the backseat, with a child between them. (Id. at p. 81). While talking with the driver, Officer Kay noticed that Mr. Corona kept looking around, appeared nervous, and had a black White Sox hat on his lap. (Id. at p. 82). Officer Kay also observed Mr. Corona's neck tattoos. (Id.).

In a typical traffic stop, the officers would obtain all vehicle occupants' names and birthdates, but Officer Garcia focused first on Mr. Corona based on his nervous behavior. (Id. at p. 33). Mr. Corona said he did not have an ID, but stated his name was Jonathan Rojas and provided a date of birth. (Id. at p. 9). This interaction occurred less than a minute after the officers pulled the vehicle over. (Ex. 1 at 00:55). The officers then returned to the patrol vehicle. While walking back to the patrol vehicle, Officer Kay asked Officer Garcia, referring to Mr. Corona, "What is he, an Oldie?" and "Is he gonna run?" (Doc. 247 at p. 84–85; Ex. 1 at 1:41–49). Officer Garcia ran a warrants check on Jonathan Rojas, which stated "no record found." (Doc. 247 at p. 10). An in-house record check returned a similar name, but the mugshot tied to that name clearly was not Mr. Corona. (Id.). Based on these results, Officer Garcia

suspected Mr. Corona had given a false name. (Id.). Based on the officers' observations—Mr. Corona's nervousness, appearance indicating gang membership, apparent false name, and the fact they were in a high-crime neighborhood with frequent gang shootings—the officers decided to remove Mr. Corona from the Acura. (Id. at p. 10–11). Officer Garcia returned to the Acura and asked Mr. Corona to step out of the car. (Id. at p. 40–41). At this point, approximately four minutes had passed since the car was first pulled over. (Ex. 1 at 3:51).

After Mr. Corona stepped out of the car, Officer Garcia patted him down for weapons. (Doc. 247 at p. 11). Officer Garcia observed that Mr. Corona was sweaty and shaking, even though it was chilly outside, and was looking around as though he would attempt to flee or fight. (Id.). Based on these observations, Officer Garcia placed Mr. Corona in handcuffs. (Id.). As they walked back towards the patrol vehicle, Officer Garcia again asked Mr. Corona what his name was, and he replied with his correct name. (Id. at p. 12). When they got into the patrol vehicle, Mr. Corona said he had warrants. (Id. at p. 13). At that point, based on the high-crime neighborhood and Mr. Corona's behavior, Officer Garcia asked Mr. Corona if there were guns or drugs in the vehicle. (Id.). Mr. Corona did not answer, but when asked again, he acknowledged there was a firearm in the vehicle. (Id.). At this point, the stop had lasted approximately five minutes. (Ex. 1 at 5:20).

Officer Garcia immediately notified Officer Kay and other backup officers that there was a firearm in the vehicle. (Doc. 247 at p. 16; Ex. 1 at 5:20). The

child was unsecured and moving around in the vehicle as the officers removed each person individually from the vehicle.  (Ex. 1 at 6:11).  After about three minutes of searching, the officers found the firearm hidden in the rear pouch of the driver's seat.  (Doc. 247 at p. 16–17; Ex. 1 at 8:09).  After the officers secured the scene and removed the firearm, Officer Garcia returned to the patrol vehicle and read Mr. Corona his Miranda rights.  (Doc. 247 at p. 17).  Mr. Corona stated he understood his rights and wished to talk to Officer Garcia.  (Id. at p. 18).  He then explained he hid the firearm because he knew the officers would discover his true identity and learn he had warrants, and he hoped they would not find the weapon.  (Id.).

On November 22, 2017, a federal grand jury returned a Superseding Indictment in the District of South Dakota alleging that Mr. Corona and others murdered Vincent Von Brewer III in Pine Ridge, South Dakota on October 16, 2017.  (Id.).  Mr. Corona was arrested in Colorado on November 30, 2017.

## DISCUSSION

Mr. Corona asks this court to suppress evidence obtained during the search of the vehicle, as well as any statement he made to law enforcement during the traffic stop.  Mr. Corona argues that the officers had no justification to expand the scope of the traffic stop; after the officers initiated the traffic stop, he was under *de facto* arrest; the officers thereafter elicited incriminating statements from him in violation of his Miranda[1] rights, causing him to admit to giving a false name, being a fugitive, and possessing a gun; Officer Garcia's

---

[1]    Miranda v. Arizona, 384 U.S. 436, 472 (1966).

6

belated <u>Miranda</u> advisement did not cure the initial violation; law enforcement improperly searched the vehicle; and the public safety exception does not apply to the case. (Doc. 176 and Doc. 270).

### I. Mr. Corona has no standing to challenge the vehicle search

A defendant challenging a search has the burden to establish "that he personally has an expectation of privacy in the place searched, and that his expectation of privacy is reasonable . . . ." <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998). The challenger must prove that the expectation of privacy is subjectively reasonable and objectively reasonable, "that is, one that society is willing to accept." <u>United States v. McCaster</u>, 193 F.3d 930, 933 (1999). "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" <u>United States v. Anguiano</u>, 795 F.3d 873, 876 (8th Cir. 2015) (quoting <u>Rakas</u>, 439 U.S. at 148).

Here, there are no facts conclude that Mr. Corona had an ownership interest in the vehicle nor did his name appear on any ownership documents. See <u>Barragan</u>, 379 F.3d at 530. Furthermore, Mr. Corona fails to prove any facts showing he had a reasonable expectation of privacy in the vehicle and was anything more than a mere passenger. See <u>Anguiano</u>, 795 F.3d at 876. Because Mr. Corona was a mere passenger, he had no legitimate expectation of privacy in the vehicle, and accordingly has no standing to challenge the search. See <u>Rakas</u>, 439 U.S. at 143. Assuming *arguendo* that Mr. Corona has standing

to challenge the search, the court will analyze the constitutionality of the search.

## II. Whether the officers had reasonable suspicion to expand the scope of the initial traffic stop

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." Brendlin v. California, 551 U.S. 249, 255–56 (2007) (internal citations omitted). A stop of the driver of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle. Id.

A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal citations and quotations omitted). Mr. Corona does not challenge the validity of the initial traffic stop based on the license plate infraction. (Doc. 270 at p. 1–2).

After an initial stop, the resulting detention must be no longer than reasonably necessary and must be reasonably related to the circumstances which initially justified the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005); United States v. Sharpe, 470 U.S. 675, 685–87 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983); Terry v. Ohio, 392 U.S. 1, 30 (1968) (Law enforcement

8

officers may detain an individual for a brief period of time if they have reasonable suspicion that criminal activity is afoot). There are no rigid time limitations on a Terry stop. Sharpe, 470 U.S. at 685; United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993). Rather, the court is to consider the purposes for which law enforcement stopped the vehicle as well as the time reasonably needed to effectuate those purposes. Sharpe, 470 U.S. at 685. The court must consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 686.

During an investigative stop, officers may permissibly detain vehicle occupants while performing routine tasks such as obtaining a driver's license and vehicle registration and inquiring about the occupants' destination and purpose. United States v. Coleman, 700 F.3d 329, 335 (8th Cir. 2012). If the vehicle occupants' responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot, officers may expand the scope of the stop beyond the initial justification and prolong the detention. United States v. Chavez Loya, 528 F.3d 546, 553 (8th Cir. 2008). It is the government's burden to prove that a detention pursuant to reasonable suspicion was sufficiently limited in scope and duration. Royer, 460 U.S. at 500.

In determining whether the officers' observations during the course of the stop rise to an objectively reasonable suspicion of criminal activity, the court examines "the totality of the circumstances in light of the [officers'] experience."

9

Chavez Loya, 528 F.3d at 553 (8th Cir. 2008) (internal citations omitted). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory [detention]." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). In forming a basis for suspicion officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). A number of factors, innocent in and of themselves, may give rise to reasonable suspicion in the eyes of a trained law enforcement officer. United States v. Barker, 437 F.3d 787, 790 (8th Cir. 2006). "While the defendant's presence in a dangerous area is not by itself enough to raise a reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." United States v. Atlas, 94 F.3d 447, 451 (8th Cir. 1996) (internal quotation omitted) (finding reasonable suspicion where defendant was located in high-crime neighborhood with heavy gang activity, appeared very nervous when he saw officers, threw bag to the ground, and gave evasive answers).

Because "traffic stops are especially fraught with danger to police officers . . . the risk of harm to both the police and the occupants of a stopped vehicle is minimized . . . if the officers routinely exercise unquestioned command of the situation." Arizona v. Johnson, 555 323, 330 (2009) (internal quotations and alterations omitted). Therefore, during a routine traffic stop, police officers

"may order out of a vehicle both the driver and any passengers [and] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." Knowles v. Iowa, 525 U.S. 113, 118 (1998); United States v. Navarrete–Barron, 192 F.3d 786, 790 (8th Cir. 1999) (officers may take any steps reasonably necessary to protect their safety and maintain the status quo).

     The court finds that Officers Garcia and Kay were justified in expanding the scope of the initial traffic stop by removing Mr. Corona from the vehicle, patting him down, and taking him to the patrol vehicle for further questioning. Both officers were experienced members of the Denver Gang Bureau and were knowledgeable about gang activity in the area. Based on the officers' own experience with gangs, and Mr. Corona's possible false identification, nervous behavior, evasive answers, tattoos, and clothing, it was reasonable for the officers to suspect Mr. Corona was affiliated with a gang and involved in criminal activity. See Chavez Loya, 528 F.3d at 553. It was further reasonable for Officer Garcia to conduct a pat-down search of Mr. Corona based on his experience that gang members often carry firearms. Knowles, 525 U.S. at 118. The scope and the duration of the stop was strictly limited to investigating whether there was contraband in the vehicle and then finding the weapon. Royer, 460 U.S. at 500. The officers operated quickly and efficiently: Officer Kay found the firearm approximately eight minutes after initiating the traffic stop. The court finds that the stop was reasonably limited in scope and duration, and the officers' conduct lawfully expanded the scope of the

investigation while maintaining the status quo and protecting officer safety. Sharpe, 470 U.S. at 685; Navarrete–Barron, 192 F.3d at 790.

### III. Whether Mr. Corona's statements were obtained in violation of his Miranda rights

Mr. Corona argues he was subject to the functional equivalent of a formal arrest when questioned by Officer Garcia, necessitating the advisement of his Miranda rights. Mr. Corona requests that all statements he made to Officer Garcia be suppressed. The government argues Officer Garcia's request for identification did not implicate Miranda; that the questioning about the gun was permissible under public safety concerns; and that Mr. Corona was not in custody.

A criminal suspect in custody must be informed of his right to remain silent and to have counsel appointed before being interrogated. Miranda v. Arizona, 384 U.S. 436, 472, 479 (1966)). Miranda's protections only apply to a custodial interrogation. Id. Most persons temporarily detained pursuant to a Terry stop are not "in custody," even though they are not free to leave until the completion of the brief investigation. United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). "In a routine traffic stop, detention of an individual is usually temporary and public." United States v. Boucher, 909 F.2d 1270, 1174 (8th Cir. 1990). The atmosphere of a traffic stop is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself." Berkemer v. McCarty, 468 U.S. 420, 439 (1984). For these reasons, generally "[n]o Miranda warning is necessary for persons detained for

12

a Terry stop." United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986); Berkemer, 468 U.S. at 440; Pelayo-Ruelas, 345 F.3d at 592.

A person is not automatically in custody for the purposes of Miranda simply because the questioning is conducted in a certain place, i.e., a patrol car, or because the person being questioned is suspected of having committed some offense.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Officers may "brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety" when presented with serious danger in the course of carrying out an investigative detention.  United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004) (citations omitted); see United States v. Navarrete–Barron, 192 F.3d 786, 790 (8th Cir. 1999).

During a Terry stop, officers may ask investigative questions to confirm or dispel their suspicions without implicating Miranda.  Pelayo-Ruelas, 345 F.3d at 592–93.  "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."  Adams v. Williams, 407 U.S. 143, 145 (1972).  An "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  Johnson, 555 U.S. at 333 (internal citations omitted) (holding that officer lawfully extended investigative stop and defendant was not in custody where, during traffic stop, officer observed defendant was wearing clothing consistent with Crips

13

membership; when questioned, defendant stated he was from a town known for Crips affiliation, and that he had served time in prison for a burglary; the officer then removed defendant from the vehicle to question him and "gain intelligence about the gang [he] might be in"); Pelayo-Ruelas, 345 F.3d at 592 (holding that defendant was not in custody and no Miranda warnings were necessary where defendant informed agent during traffic stop that he was an illegal alien; agent removed defendant from vehicle, conducted pat-down search for weapons, and continued questioning defendant about why he was in Minnesota to confirm or dispel suspicions regarding illegal drug trafficking).

The court finds that Mr. Corona was neither in custody nor interrogated for purposes of Miranda when Officer Garcia questioned him in the patrol vehicle. First, Officer Garcia's steps to secure the scene and continue the investigation did not render Mr. Corona in custody for purposes of Miranda. See Fisher, 364 F.3d at 973; Pelayo-Ruelas, 345 F.3d at 592; McGauley, 786 F.2d at 890. When the officers ran the name "Jonathan Rojas" and found no results, they developed a reasonable suspicion that Mr. Corona had provided a false identity. The officers suspected Mr. Corona was affiliated with a gang based on his attire and tattoos, and knew from experience that gang members in the neighborhood often carry firearms. The officers also believed, based on their experience, that Mr. Corona was preparing to fight or flee. The detention took place in a public place. Under these circumstances, Officer Garcia was justified in handcuffing Mr. Corona and transporting him to the patrol vehicle while continuing the investigation. This course of conduct was sufficiently

limited in scope to satisfy the conditions of an investigative seizure, while maintaining the status quo.  See Mathiason, 429 U.S. at 495; Florida v. Royer, 460 U.S. 491, 500 (1983); Navarrete–Barron, 192 F.3d at 790.  Second, Officer Garcia's questions did not constitute interrogation because they were directed at confirming Mr. Corona's identity and dispelling his suspicions that the vehicle contained contraband or firearms.  See Pelayo-Ruelas, 345 F.3d at 592.  For these reasons, the court finds Miranda was not implicated.  Because there was no initial Miranda violation, Mr. Corona's subsequent Miranda waiver was not tainted.

**IV.    The Public Safety Exception**

Because the court finds that Mr. Corona was neither in custody nor interrogated, Miranda was not implicated and no warnings were necessary.  However, even if Mr. Corona was subjected to a custodial interrogation, his statements would be admissible under the public safety exception to Miranda articulated in New York v. Quarles, 467 U.S. 649 (1984).

In Quarles, the Supreme Court held that "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence."  467 U.S. at 655.  In this context, protection of the public safety includes protection of the police officers themselves.  Id. at 658 n. 7.  The exception does not depend upon the subjective motivation of the questioning officers.  Instead, the Court adopted an objective standard: the exception applies when "police officers ask questions reasonably prompted by a concern for the public safety."  Id. at 656.  It does

not apply to "questions designed solely to elicit testimonial evidence from a suspect." Id. at 659.

In applying the public safety exception, the Eighth Circuit has recognized that "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search." United States v. Liddell, 517 F.3d 1007, 1009–10 (8th Cir. 2008); see United States v. Watters, 572 F.3d 479, 482–83 (8th Cir. 2009) (public safety exception applied to officer's post-arrest question to defendant about whether there was a gun somewhere in busy nightlife area, where dispatch had reported defendant was trying to buy drugs and had said he had a shotgun, and officers feared that suspected gun could be accessible to defendant's friends or to public); United States v. Williams, 181 F.3d 945, 953–54 (8th Cir. 1999) (public safety exception applied to post-arrest question, "is there anything we need to be aware of" in suspect's apartment, because the police "could not have known whether other hazardous weapons were present . . . that could cause them harm if they happened upon them unexpectedly or mishandled them in some way").

Mr. Corona characterizes the government's argument as an attempt to create a "child in the car" exception to Miranda, permitting officers to interrogate vehicle occupants every time a child is present. (Doc. 176 at p. 7). Mr. Corona additionally distinguishes Watters and other public safety cases

16

from this case by arguing that here, the officers simply speculated something in the car could harm the child; in other cases applying the public safety exception, officers had specific information regarding defendants' danger.  (Id.). The court sees the facts differently.  Officers Garcia and Kay did in fact have specific information creating a public safety concern.  First, and significantly, both officers have years of experience on the gang bureau patrolling the high-crime neighborhood in which the stop occurred.   Based on that extensive experience with heavy gang activity in the area, the officers knew many gang members often carry firearms and/or drugs.  The officers developed an immediate and reasonable suspicion that Mr. Corona was affiliated with a gang, leading to a fear he or others in the vehicle were armed.  The presence of three other unsecured individuals in the vehicle and one toddler, combined with the officers' knowledge about gang members carrying firearms, created a real and imminent risk of danger to the public and the officers themselves. Officer Garcia acted quickly and limited his questioning to whether there was a firearm or contraband in the Acura.  When Mr. Corona stated there was a gun in the car, Officer Garcia immediately ceased questioning and acted on the information by informing the other officers and securing the vehicle occupants. Given all these factors, the court finds that Officer Garcia's questioning was reasonably prompted by a concern for public safety and was designed for that purpose.  Quarles, 467 U.S. at 656, 659.

**CONCLUSION**

For the aforementioned reasons, it is respectfully recommended that Mr. Corona's motion to suppress be denied in full.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 27th day of December, 2018.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge